**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MERCK & CO, INC., ELI LILLY AND COMPANY, AMGEN INC., and ASSOCIATION OF NATIONAL ADVERTISERS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ALEX M. AZAR II, in his official capacity as the Secretary of the United States Department of Health and Human Services, CENTERS FOR MEDICARE & MEDICAID SERVICES, and SEEMA VERMA, in her official capacity as the Administrator of the Centers for Medicare & Medicaid Services, <br><br> Defendants. | Case No. 1:19-cv-01738-APM |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR A STAY PENDING JUDICIAL REVIEW**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

I.     DIRECT-TO-CONSUMER MESSAGING REGARDING HEALTH
       CONDITIONS AND TREATMENTS ...........................................................................4

       A.     The Benefits Of Direct-To-Consumer Advertisements ...........................................4

       B.     Existing Regulation Of Direct-To-Consumer Advertising For
              Pharmaceutical Products .........................................................................................7

II.    THE PHARMACEUTICAL PRICING SYSTEM .............................................................9

III.   THE COMPELLED WAC DISCLOSURE RULE .........................................................15

LEGAL STANDARD.............................................................................................................20

ARGUMENT ........................................................................................................................21

I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...................................21

       A.     THE COMPELLED WAC DISCLOSURE RULE EXCEEDS HHS'S
              AUTHORITY UNDER THE SOCIAL SECURITY ACT...................................21

              1.     Congress Has Spoken Clearly—And Imposed Clear Limits—When
                     It Has Intended To Authorize HHS To Regulate Advertising..................21

              2.     HHS Cannot Expand Its Authority Over Advertising By Invoking
                     Its Ability To Promulgate Regulations Necessary For The
                     Administration Of The Medicare And Medicaid Programs .....................23

       B.     THE COMPELLED WAC DISCLOSURE RULE VIOLATES THE FIRST
              AMENDMENT.................................................................................................28

              1.     The Compelled WAC Disclosure Rule Cannot Survive Intermediate
                     Scrutiny .................................................................................................28

                     a.     HHS Cannot Show That The Compelled WAC Disclosure
                            Rule Directly And Materially Advances A Substantial
                            Government Interest....................................................................29

                            (1)    The Rule Will Undermine, Rather Than Further, Any
                                   Government Interest In Accurate Consumer
                                   Understandings Of Pharmaceutical Prices.........................29

(2)    HHS Has Acknowledged It Cannot Show The Compelled WAC Disclosure Rule Will Directly And Materially Reduce Costs To The Medicaid And Medicare Programs ............................................................34

b.    HHS Cannot Show That It Could Not Achieve Its Asserted Interest Through Alternative Less-Restrictive, And Equally Effective, Means ..........................................................................36

2.    HHS Cannot Carry Its Burden To Show That The Compelled WAC Disclosure Rule Is Eligible For, And Would Pass Muster Under, Zauderer's More Deferential Review .......................................38

II.    THE REMAINING INTERIM-RELIEF FACTORS READILY SUPPORT A STAY ............................................................................................................43

A.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE RULE GOES INTO EFFECT ........................................................................43

B.    THE PUBLIC INTEREST AND BALANCE OF EQUITIES REQUIRE A STAY ..............................................................................................44

CONCLUSION....................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Affinity Healthcare Servs., Inc. v. Sebelius*,
  720 F. Supp. 2d 12 (D.D.C. 2010) ....................................................................20

*\*Am. Meat Inst. v. U.S. Dep't of Agric.*,
  760 F.3d 18 (D.C. Cir. 2014) (en banc) ..................................................... *passim*

*Am. Petroleum Inst. v. EPA*,
  52 F.3d 1113 (D.C. Cir. 1995) .......................................................................24

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988) ......................................................................................21

*Cal. Ass'n of Private Postsecondary Schs. v. DeVos*,
  344 F. Supp. 3d 158 (D.D.C. 2018) ...............................................................44

*\*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
  447 U.S. 557 (1980) ......................................................................................28

*Elrod v. Burns*,
  427 U.S. 347 (1976) ......................................................................................43

*\*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000) ................................................................................26, 45

*Fed. Mar. Comm'n v. Seatrain Lines, Inc.*,
  411 U.S. 726 (1973) ......................................................................................24

*Giant Food Inc. v. FTC*,
  322 F.2d 977 (D.C. Cir. 1963) .......................................................................41

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) ......................................................................................24

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) .......................................................................45

*Greater New Orleans Broad. Ass'n v. United States*,
  527 U.S. 173 (1999) ................................................................................29, 36

*King v. Burwell*,
  135 S. Ct. 2480 (2015) ..................................................................................26

*Mot. Picture Ass'n of Am., Inc. v. FCC,*
309 F.3d 796 (D.C. Cir. 2002) ............................................................ 27

*\*Nat'l Ass'n of Mfrs. v. SEC,*
800 F.3d 518 (D.C. Cir. 2015) .................................................... passim

*Nat'l Cable Television Ass'n v. United States,*
415 U.S. 336 (1974) ........................................................................... 27

*\*Nat'l Inst. of Family & Life Advocates v. Becerra,*
138 S. Ct. 2361 (2018) ....................................................... 37, 38, 39, 43

*Nat'l Mining Ass'n v. U.S. Dep't of the Interior,*
105 F.3d 691 (D.C. Cir. 1997) ....................................................... 24, 26

*Nken v. Holder,*
556 U.S. 418 (2009) ....................................................................... 20, 45

*Panama Refining Co. v. Ryan,*
293 U.S. 388 (1935) ........................................................................... 26

*In re Permanent Surface Mining Regulation Litig.,*
653 F.2d 514 (D.C. Cir. 1981) (en banc) ........................................... 26

*Pursuing Am.'s Greatness v. Fed. Election Comm'n,*
831 F.3d 500 (D.C. Cir. 2016) .................................................. 4, 21, 43

*Reed v. Town of Gilbert, Ariz.,*
135 S. Ct. 2218 (2015) ....................................................................... 28

*Riley v. Nat'l Fed'n of Bind of N.C., Inc.,*
487 U.S. 781 (1988) ........................................................................... 37

*\*RJ Reynolds Tobacco Co. v. FDA,*
696 F.3d 1205 (D.C. Cir. 2012) .................................................... 29, 40

*Sorrell v. IMS Health Inc.,*
564 U.S. 552 (2011) ....................................................................... 28, 35

*Teva Pharm. Indus. Ltd. v. Crawford,*
410 F.3d 51 (D.C. Cir. 2005) ............................................................. 24

*United States v. E.I. Dupont de Nemours & Co.,*
432 F.3d 161 (3d Cir. 2005) ............................................................... 27

*\*Util. Air Regulatory Grp. v. EPA,*
573 U.S. 302 (2014) ....................................................................... 3, 26

*Video Software Dealers Ass'n v. Schwarzenegger*,
  556 F.3d 950 (9th Cir. 2009) ...........................................................35

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001)..........................................................................26

*Wooley v. Maynard*,
  430 U.S. 705 (1977)..........................................................................28

*\*Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio*,
  471 U.S. 626 (1985)...........................................................18, 39, 40

## STATUTES

5 U.S.C. § 705........................................................................2, 4, 20

21 U.S.C.
  § 321(n)...............................................................................................8
  § 331(n)...............................................................................................8
  § 352(a)...............................................................................................8
  § 352(n).................................................................................8, 21, 24
  § 353c...........................................................................................8, 22

42 U.S.C.
  § 1302(a)...........................................................................................16
  § 1395hh(a).......................................................................................16
  § 1395w-3a(c)(6)(B)..........................................................................12
  § 1395w-21(h)...................................................................................23

Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251 (1997) ...................................23

Drug Amendments of 1962, Pub. L. No. 87-781, 76 Stat. 780 (1962)..........................................21

Food and Drug Administration Amendments Act of 2007, Pub. L. No. 110-85,
  121 Stat. 823 (2007)..........................................................................22

Social Security Act
  Section 1102(a)...........................................................................16, 25
  Section 1871(a)...........................................................................16, 25

## REGULATIONS

16 C.F.R.
  § 233.3(a)......................................................................................9, 30
  § 233.3(d)......................................................................................9, 41

21 C.F.R.
    § 202.1(e)(1) ...............................................................................................8
    § 202.1(e)(5)(i)-(iii) ...................................................................................8

42 C.F.R. § 403.1203 ........................................................................................17

*Effect of Promotional Offers in Direct-to-Consumer Prescription Drug Print*
    *Advertisements on Consumer Product Perceptions*, 76 Fed. Reg. 58,011
    (Sept. 19, 2011) ....................................................................................9

*Experimental Study of the Impact of Coupons Embedded in Direct-to-Consumer*
    *Prescription Drug Print Advertisements on Consumer Perceptions of Product*
    *Risks and Benefits*, 73 Fed. Reg. 76,034 (Dec. 15, 2008) ..........................22

*HHS Blueprint to Lower Drug Prices and Reduce Out-of-Pocket Costs*,
    83 Fed. Reg. 22,692 (May 16, 2018) ........................................................15

*Medicare and Medicaid Programs; Regulation to Require Drug Pricing*
    *Transparency*, 84 Fed. Reg. 20,732 (May 10, 2019) (to be codified at 42
    C.F.R. pt. 403) ........................................................................... *passim*

*Medicare and Medicaid Programs; Regulation to Require Drug Pricing*
    *Transparency*, 83 Fed. Reg. 52,789 (proposed Oct. 18, 2018) (to be codified at
    42 C.F.R. pt. 403) ....................................................................... *passim*

*Memorandum of Understanding Between Federal Trade Commission and the*
    *Food and Drug Administration*, 36 Fed. Reg. 18,539 (Sept. 16, 1971) ...................9

*Modernizing Part D and Medicare Advantage To Lower Drug Prices and Reduce*
    *Out-of-Pocket Expenses*, 84 Fed. Reg. 23,832 (May 23, 2019) (to be codified
    at 42 C.F.R. pts. 422, 423) ......................................................................38

*Reminder Labeling and Reminder Advertisements for Prescription Drugs*,
    40 Fed. Reg. 58,794 (Dec. 18, 1975) ...................................................8, 22

## OTHER AUTHORITIES

Am. Acad. of Neurology, *Comment Letter on Proposed Rule for Medicare and*
    *Medicaid Programs: Drug Pricing Transparency CMS* (Dec. 5, 2018),
    https://www.regulations.gov/contentStreamer?documentId=CMS-2018-0123-
    0056&attachmentNumber=1&contentType=pdf...............................................19

Amgen, *Neulasta® (pegfilgrastim) Cost Assistance, Tools, And Resources*,
    https://www.neulasta.com/support/ (last visited June 14, 2019) ............................11

Andrew Austin & Jane G. Gravelle, CRS, *Does Price Transparency Improve*
    *Market Efficiency? Implications of Empirical Evidence in Other Markets for*
    *the Health Sector* (2007) ......................................................................18

Cancer Support Cmty., *Comment Letter on Proposed Rule for Medicare and Medicaid Programs: Drug Pricing Transparency* (Nov. 17, 2018), https://www.regulations.gov/contentStreamer?documentId=CMS-2018-0123-0038&attachmentNumber=1&contentType=pdf .................................................... 19

Cong., 2d Sess. 131 (Oct. 12, 1994) (statement of Mary K. Pendergast, Deputy Comm'r/Senior Advisor to Comm'r, FDA) .................................................................. 10

FDA, HHS, *Guidance for Industry: Consumer Directed Broadcast Advertisements* (1999), https://www.fda.gov/media/75406/download .................................... 37

Inst. for Policy Integrity, *Comment Letter on Proposed Rule for Medicare and Medicaid Programs: Drug Pricing Transparency* (Dec. 17, 2018), https://www.regulations.gov/contentStreamer?documentId=CMS-2018-0123-0085&attachmentNumber=1&contentType=pdf .................................................... 18

Jace B. Garrett et al., *Consumer Responses to Price Disclosure in Direct-to-Consumer Pharmaceutical Advertising*, 179 JAMA Internal Med. 435 (2019) ..................... 33

Joel S. Weissman et al., *Consumers' Reports on the Health Effects of* ......................................... 6

John F. Cady, *An Estimate of the Price Effects of Restrictions on Drug Advertising*, 44 Econ. Inquiry 493 (1976) .............................................................. 18

Kathryn J. Aikin et al., FDA, *Patient and Physician Attitudes and Behaviors Associated with DTC Promotion of Prescription Drugs—Summary of FDA Survey Research Results* (2004), https://www.fda.gov/media/112016/download ....................................................5, 6

Lilly USA, *Emgality Pricing Information*, https://www.lillypricinginfo.com/emgality (last visited June 14, 2019) ................................ 11

Michael Sinkinson & Amanda Starc, *Ask Your Doctor? Direct-to-Consumer Advertising of Pharmaceuticals*, 86 Review of Econ. Studies 836 (2017) .............................. 7

Murray Aitken & Silvia Valkova, IMS Inst. for Healthcare Informatics, *Avoidable Costs in U.S. Healthcare: The $200 Billion Opportunity from Using Medicines More Responsibly* (2013), http://offers.premierinc.com/rs/381-NBB-525/images/Avoidable_Costs_in%20_US_Healthcare-IHII_AvoidableCosts_2013%5B1%5D.pdf ............................................................ 7

Nat'l All. on Mental Illness, *Comment Letter on Proposed Rule for Medicare and Medicaid Programs: Drug Pricing Transparency* (Dec. 17, 2018), https://www.regulations.gov/contentStreamer?documentId=CMS-2018-0123-0112&attachmentNumber=1&contentType=pdf .................................................... 19

*Necessary (adj.)*, Oxford English Dictionary,
    https://www.oed.com/view/Entry/125629?redirectedFrom=Necessary#eid
    (last visited June 14, 2019) ........................................................................25

Nilesh S. Bhutada & Brent L. Rollins, *Disease-Specific Direct-to-Consumer*
    *Advertising for Reminding Consumers to Take Medications*, 55 J. Am.
    Pharmacists Ass'n 434 (2015) ..................................................................6

PhRMA, *2018 Biopharmaceutical Research Industry Profile and Toolkit*,
    https://www.phrma.org/industryprofile/2018/ (last visited June 14, 2019)..............................5

PhRMA, *Comment Letter on HHS Blueprint to Lower Drug Prices and Reduce*
    *Out-of-Pocket Costs* at 120 (July 16, 2018),
    https://www.regulations.gov/contentStreamer?documentId=CMS-2018-0075-
    2808&attachmentNumber=1&contentType=pdf ....................................15

PhRMA, *Direct to Consumer Advertising Principles* (2018),
    https://www.phrma.org/codes-and-guidelines/direct-to-consumer-advertising-
    principles....................................................................................................11

PhRMA, *PhRMA Guiding Principles: Direct to Consumer Advertisements about*
    *Prescription Medicines* (2018),
    https://www.phrma.org/files/dmfile/PhRMA_Guiding_Principles_2018.pdf;.......................37

Princeton Survey Research Assocs. Int'l, *2017 Direct to Consumer Advertising*
    *Survey* 23 (2017), https://www.phrma.org/report/2017-direct-to-consumer-
    advertising-survey-results............................................................................6

*Questionable Sales Practices in the Drug Industry: Hearing Before the Subcomm.*
    *on Regulation, Bus., Opportunity, & Tech., Comm. on Small Bus.*,
    103rd Cong. 131 (Oct. 12, 1994) ...............................................................10

S. 1437, 165 Cong. Rec. S2775, 116th Cong. 1st Sess. (daily ed. May 13, 2019)......................28

S. Amend. No. 3964, 164 Cong. Rec. S5871, 115th Cong. 2d Sess. (daily ed. Aug.
    23, 2018) ....................................................................................................28

*See* Joel S. Weissman et al., *Consumers' Reports on the Health Effects of Direct-*
    *to-Consumer Drug Advertising*, Health Affairs, Feb. 26, 2003,
    https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.W3.82 .................................6

## INTRODUCTION

Americans deserve accurate information about their expected out-of-pocket costs for prescription drugs.  This case involves a rule adopted by the Department of Health and Human Services (HHS) that purports to further that objective, but will instead frustrate it—by misleading patients about their out-of-pocket costs for prescription drugs in a manner that even HHS admits may "confuse[]" and "intimidate[]" patients, "discourage patients from using beneficial medications, reduce access, and potentially increase total cost of care."  *Medicare and Medicaid Programs; Regulation to Require Drug Pricing Transparency*, 84 Fed. Reg. 20,732, 20,756 (May 10, 2019).

Relying on an unprecedentedly broad construction of the agency's authority to enact regulations for the "efficient administration" of the Medicare and Medicaid programs, the rule requires virtually all direct-to-consumer pharmaceutical television advertisements to include a government-scripted statement highlighting what it describes as the "list price" of the advertised product.  That "list price" is not, as patients will likely infer from the context, a suggested sales price for the retail transactions contemplated in the advertisements.  Rather, the rule requires manufacturers to convey as the "list price" the gross price at which a prescription drug is offered to *wholesalers*, before rebates, discounts, or any other adjustments are applied.  That mandated price figure not only ignores such wholesale price adjustments, but also fails to account for the insurance coverage that a significant majority of Americans have for their retail purchases of prescription drugs.  As a result, the "list price" that the rule requires manufacturers to convey to patients is often multiple times higher than what a substantial majority of Americans would pay for the advertised products.  Far from promoting transparency and improved decision-making, therefore, the rule would instead force pharmaceutical companies to mislead tens of millions of

Americans about the cost they would actually incur for important medicines that might improve their health or even save their lives.

Plaintiffs, a group of leading innovative biopharmaceutical companies and a trade association that counts such companies among its members, initiated this suit to set aside the rule under Section 706 of the Administrative Procedure Act because it exceeds HHS's statutory authority and violates the First Amendment.  Absent action by this Court, the rule will be effective July 9, 2019.  By this motion, Plaintiffs ask the Court to act under Section 705 of the Administrative Procedure Act to "postpone the effective date" of the rule in order "to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.  Like a preliminary injunction, such relief is appropriate where a challenging party shows that it is likely to prevail on the merits, that it would suffer irreparable harm absent judicial intervention, and that the balance of equities and public interest favor a delay.  All of those requirements are met here.

Plaintiffs are highly likely to succeed on the merits.  To begin with, HHS has no statutory authority to require price disclosures in direct-to-consumer television advertisements.  It acknowledges that Congress has never expressly granted it such authority.  Indeed, the Food and Drug Administration (FDA)—the agency within HHS with primary responsibility for regulating such advertisements—has long conceded that it *cannot* require such disclosures.  In light of that longstanding concession, HHS opted to promulgate this rule instead through the Centers for Medicare & Medicaid Services (CMS).  But, unlike the FDA, CMS does not regulate the sale and marketing of drugs by manufacturers.  It has never before even attempted to regulate pharmaceutical advertisements, and its applicable rulemaking authority under the Social Security Act is limited to rules that are "necessary" for the "administration" of the Medicare and Medicaid programs.  HHS reasons that this general authorization is sufficient here because the rule might

indirectly lead to lower wholesale drug prices and, if it does so, benefit the Medicare and Medicaid programs. But Congress would not have conveyed rulemaking authority of that extraordinary breadth—covering anything that might conceivably affect healthcare prices—in vague provisions about making rules for the "administration" of Medicare and Medicaid, nor would such authority have gone undiscovered for decades. *See, e.g.*, *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" (citation omitted)). If HHS wants the power to regulate anything and everything that could affect healthcare costs in this country, it must persuade Congress to give it that authority—it cannot simply "discover" the power lurking in a pair of innocuous provisions that have never before been read with such breadth.

Beyond the statutory problem, moreover, lies a constitutional one. As Plaintiffs explain at length below, the statement that HHS is demanding pharmaceutical manufacturers include in their consumer advertisements is highly misleading. Tens of millions of Americans will understand from that statement that their costs for the advertised drug would be many times higher than they actually would. Indeed, HHS *acknowledges* that because of the way it has formulated the statement, patients could incorrectly "believe they are being asked to pay the list price rather than a co-pay or co-insurance," and that they will be "intimidated and confused by high list prices" that, in reality, they would not need to pay. 84 Fed. Reg. at 20,756. It is a bedrock First Amendment principle that the government cannot compel speakers to read from a misleading script of that sort. And making matters worse, the government cannot even show that its misleading message will actually produce the results it relies upon to justify its First Amendment encroachment. To the contrary, HHS concedes that "[w]e lack data to" show that the rule will be effective in increasing transparency or bringing down costs. *Id.* Given the government's burden to prove that a compelled

speech "measure . . . would 'in fact alleviate' the harms it recite[s] 'to a material degree,'" *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 526-27 (D.C. Cir. 2015) (citation omitted), that lack of evidence means the rule cannot survive.

Because this Court is likely to conclude that the rule is unlawful, the remaining stay considerations all weigh heavily in Plaintiffs' favor here.  Without this Court's intervention, Plaintiffs will be required to parrot a government message that they firmly believe will mislead and confuse patients about their out-of-pocket costs for medications.  Such a "loss of First Amendment 'freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury."'" *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).  Moreover, the government has no legitimate interest, and the public has no interest at all, in the government's enforcement of rules that violate constitutional rights or exceed statutory limits, especially where—as here—the effect of doing so would be to mislead millions of Americans about issues tied closely to their health, and discourage many Americans from taking necessary action to address their healthcare needs.

For all of these reasons, as set forth in greater detail below, Plaintiffs respectfully suggest that a stay of the effective date of the rule should issue to preserve the status quo and preserve Plaintiffs' rights pending conclusion of this action.  *See* 5 U.S.C. § 705.

## BACKGROUND

## I.    DIRECT-TO-CONSUMER MESSAGING REGARDING HEALTH CONDITIONS AND TREATMENTS

### A.    The Benefits Of Direct-To-Consumer Advertisements

Today, Americans who want to learn about how to care for their health, and that of their loved ones, have more sources of information than ever before.  They can and do rely on their doctors, insurance companies, government agencies, and numerous other sources to gather

information about health conditions they may be experiencing and the treatments available for those conditions.

Pharmaceutical research and development companies play a central role in providing that information. Innovative pharmaceutical manufacturers spend tens of billions of dollars researching and developing new biopharmaceutical products every year. *See* PhRMA, *2018 Biopharmaceutical Research Industry Profile and Toolkit*, https://www.phrma.org/industryprofile/2018/ (last visited June 14, 2019). Those efforts include rigorous clinical trials to determine the efficacy and potential side effects of new treatments. And once a product is approved by the FDA, pharmaceutical manufacturers use their extensive research to educate physicians and other healthcare professionals about how the product can be used most effectively and safely to care for their patients.

In addition to educating healthcare providers, pharmaceutical manufacturers also communicate directly to members of the public about treatment options they might want to discuss with their doctor if they suffer from a certain condition. One component of this public education is direct-to-consumer (or "DTC") messaging, including television advertisements, about specific pharmaceutical products. These direct-to-consumer advertisements play an important role in empowering patients to take an active, engaged role in managing their health in partnership with their healthcare providers, and have substantial public-health benefits. Indeed, one landmark study by the FDA concluded that "DTC advertising seems to increase awareness of conditions and treatments, motivate questions for the healthcare provider, and help patients ask better questions." Kathryn J. Aikin et al., FDA, *Patient and Physician Attitudes and Behaviors Associated with DTC Promotion of Prescription Drugs—Summary of FDA Survey Research Results* 7 (2004), https://www.fda.gov/media/112016/download. Of the physicians surveyed, for example, 73%

reported that consumer drug advertising helped their patients ask more thoughtful questions about their health and treatment.  *See id.* at 59.

The FDA is not alone in appreciating the benefits of pharmaceutical manufacturers' direct-to-consumer advertising.  Another study, by researchers at Harvard University and Massachusetts General Hospital, found that 35% of patients surveyed had discussed a medical condition with a doctor as a result of seeing a direct-to-consumer advertisement relating to a particular condition. *See* Joel S. Weissman et al., *Consumers' Reports on the Health Effects of Direct-to-Consumer Drug Advertising*, Health Affairs, Feb. 26, 2003, at W3-82, https://www.healthaffairs.org/doi/pdf/10.1377/hlthaff.W3.82.  Of those, nearly a quarter were diagnosed with a new condition following the conversation—and more than 40% of those new conditions were categorized as "high priority" conditions according to criteria developed by the Institute of Medicine.  *See id.* at W3-82, W3-88.

Similarly, recent research by Princeton Survey Research Associates International found that 60% of respondents reported that seeing an advertisement for a prescription medicine led them to take a specific action to manage their health care, such as refilling a prescription, scheduling a doctor's appointment, or taking prescription medication.  *See* Princeton Survey Research Assocs. Int'l, *2017 Direct to Consumer Advertising Survey* 23, (2017), https://www.phrma.org/report/2017-direct-to-consumer-advertising-survey-results.  An independent study in the *Journal of the American Pharmacists Association* likewise found that "disease-specific DTC advertising can help people remember to take their prescription medication when viewed, which may lead to more positive medication-taking behavior and increased medication adherence."  Nilesh S. Bhutada & Brent L. Rollins, *Disease-Specific Direct-to-*

*Consumer Advertising for Reminding Consumers to Take Medications*, 55 J. Am. Pharmacists Ass'n 434, 434 (2015).

By raising awareness of health conditions and improving the likelihood that patients will seek necessary medical treatment, direct-to-consumer advertising not only helps patients improve their quality of life, but also produces cost savings to the healthcare system as a whole.  The IMS Institute concluded, for example, that improving patient adherence and responsible medication use could save $213 billion in U.S. healthcare costs *each year*.  Murray Aitken & Silvia Valkova, IMS Inst. for Healthcare Informatics, *Avoidable Costs in U.S. Healthcare: The $200 Billion Opportunity from Using Medicines More Responsibly* 3 (2013), http://offers.premierinc.com/rs/381-NBB-525/images/Avoidable_Costs_in%20_US_Healthcare-IHII_AvoidableCosts_2013%5B1%5D.pdf.    Reflecting the value of direct-to-consumer advertising in encouraging such adherence, economists at Yale and Northwestern have found that "the value of DTCA [*i.e.*, DTC advertising] exceeds its cost," to such an extent that DTC advertising—at least for studied medications—falls "well within the bounds of what is considered an effective health intervention."  Michael Sinkinson & Amanda Starc, *Ask Your Doctor? Direct-to-Consumer Advertising of Pharmaceuticals*, 86 Review of Econ. Studies 836, 866-69 (2017) (using econometric techniques to calculate the social costs of banning DTC advertisements for anti-cholesterol drugs).

**B.    Existing Regulation Of Direct-To-Consumer Advertising For Pharmaceutical Products**

Direct-to-consumer advertising for prescription drugs is regulated in order to ensure that the information provided to patients about medical conditions and potential treatments is accurate and non-misleading.  Congress explicitly authorized and directed the Secretary of the Department of Health and Human Services to regulate pharmaceutical advertising under the Federal Food,

Drug, and Cosmetic Act (FDCA). *See* 21 U.S.C. § 321(n) (authorizing the Secretary to regulate "misbrand[ing]" of pharmaceutical products, including "advertising" that is "misleading"); *see also id.* §§ 331(n), 352(a), 352(n), 353c. The Secretary has delegated that authority, in its entirety, to the FDA, which employs an extensive set of regulations, guidelines, and enforcement mechanisms to ensure that pharmaceutical advertisements are truthful, supported by substantial evidence, and convey a fair balance of information about a product's benefits and safety risks.

These FDA regulations specifically enumerate things that such advertisements *must* say, as well as things that they *cannot* say. For example, they cannot be false or misleading with respect to side effects, contraindications, or effectiveness; must present a fair balance between the risks and benefits of the product; and must, depending on the medium in which the advertisement appears, either disclose all the risks in the product's approved labeling or make "adequate provision" for disseminating the product's labeling to the audience. *See* 21 C.F.R. § 202.1(e)(5)(i)-(iii), (e)(1).

Although the FDA therefore can and does prescribe many things that must (or must not) be included in pharmaceutical advertisements, the agency has long recognized that it *cannot* require pharmaceutical manufacturers to disclose product prices. In 1975, a few years after issuing its first set of comprehensive regulations regarding pharmaceutical advertisements, the FDA acknowledged that under the FDCA, any "decision to engage in public disclosure of prescription drug prices is not for the Food and Drug Administration to make." *Reminder Labeling and Reminder Advertisements for Prescription Drugs*, 40 Fed. Reg. 58,794, 58,794 (Dec. 18, 1975). To Plaintiffs' knowledge, the FDA has not altered that position in the four decades since.

That the FDA cannot *require* the publication of product prices, however, is not to say that it does not *regulate* the publication of product prices. To the contrary, the FDA recognizes that,

depending on how it is presented, the inclusion of price information in drug advertisements may "result[] in an unbalanced net impression of the drug product." *Effect of Promotional Offers in Direct-to-Consumer Prescription Drug Print Advertisements on Consumer Product Perceptions*, 76 Fed. Reg. 58,011, 58,014 (Sept. 19, 2011).  As the FDA has explained, "even if a price incentive included in an advertisement is in fact 'truthful,' the net impression of the promotional piece as a whole can be unbalanced or misleading, which may in turn violate existing regulations." *Id.*

The Federal Trade Commission (FTC), the federal agency with primary responsibility for regulating advertising of most products outside of the pharmaceutical context, takes the same view.[1]  Of particular relevance here, in a set of "Guidelines Against Deceptive Pricing," the FTC has explained that "[m]any members of the purchasing public believe that a manufacturer's list price . . . is the price at which an article is generally sold."  16 C.F.R. § 233.3(a); *see also id.* § 233.3(d) (noting that outside of the pharmaceutical industry, "[t]ypically, a list price is a price at which articles are sold, if not everywhere, then at least in the principal retail outlets which do not conduct their business on a discount basis").  As a result, the FTC has concluded that viewers of consumer advertisements may be misled if the advertisement identifies a "list price" that "do[es] not in fact correspond to prices at which a substantial number of sales of the article in question are made" to the consumers at whom the advertisement is directed.  16 C.F.R. § 233.3(a).

## II.    THE PHARMACEUTICAL PRICING SYSTEM

In the absence of any legal compulsion to include pricing information in direct-to-consumer pharmaceutical advertisements, most such advertisements do not include pricing claims

---

[1] Since 1971, the FTC has recognized that the FDA has "primary responsibility with respect to the regulation of the truth or falsity of all [prescription drug] advertising." *Memorandum of Understanding Between Federal Trade Commission and the Food and Drug Administration*, 36 Fed. Reg. 18,539, 18,539 (Sept. 16, 1971).

9

about the promoted products.  Manufacturers' general reluctance to include such information stems in part from the FDA's past warnings that comparing an advertised product's price to the price of a competitor product is often misleading, inasmuch as it may suggest that the advertised product is cheaper without taking appropriate account of variables such as comparative efficacy or adverse events.  *See, e.g.*, *Questionable Sales Practices in the Drug Industry: Hearing Before the Subcomm. on Regulation, Bus., Opportunity, & Tech., Comm. on Small Bus.*, 103rd Cong., 2d Sess. 131 (Oct. 12, 1994) (statement of Mary K. Pendergast, Deputy Comm'r/Senior Advisor to Comm'r, FDA).

Manufacturer practices also reflect the difficulty of providing useful and non-misleading figures in short television advertisements.  Many have concluded that accurately explaining a product's "price" is simply not possible in the abbreviated context of a mass-market television advertisement, given (i) a multi-tiered distribution system in which manufacturers, wholesalers, pharmacies, and healthcare providers charge and pay significantly different amounts depending on whom they are selling the product to or purchasing the product from, (ii) a network of third-party payers (like private insurance companies and government health programs) that often pay the bulk of the price for a product when it is dispensed to a patient, and (iii) the myriad differing arrangements in the private insurance and government insurance contexts that determine the amounts (if any) that a patient must contribute toward the cost of the product, a calculus that often changes over the course of each year.  As HHS itself has acknowledged, "it would be too complicated to . . . try to disclose every possible cost sharing outcome in a DTC television advertisement."  84 Fed. Reg. at 20,741.  Even attempting to do so would convert an advertisement about the health benefits and risks of a given treatment into a discourse on the design of the

American healthcare system—distracting from, and potentially undermining, the message the manufacturer actually intends to convey.

Instead, many manufacturers have used their advertisements to direct consumers to sources—including company websites—where they can not only find out more information about the product's safety and efficacy (including FDA-required information about safety effects) but also obtain information that will help them determine their own out-of-pocket cost for the drug. *See, e.g.*, Lilly USA, *Emgality Pricing Information*, https://www.lillypricinginfo.com/emgality (last visited June 13, 2019) (providing information about the "list price" of Emgality, a drug manufactured by Plaintiff Eli Lilly, as well as information about estimated out-of-pocket costs for patients in four different insurance categories); Amgen, *Neulasta® (pegfilgrastim) Cost Assistance, Tools, And Resources*, https://www.neulasta.com/support/ (last visited June 13, 2019) (providing similar information for Neulasta, a drug manufactured by Plaintiff Amgen); *see also* PhRMA, *Direct to Consumer Advertising Principles* (2018), https://www.phrma.org/codes-and-guidelines/direct-to-consumer-advertising-principles (describing voluntary principles for dissemination of contextualized pricing information in connection with direct-to-consumer television advertising).

The accompanying declaration of Dr. Craig Garthwaite, the Herman R. Smith Research Professor in Hospital and Health Service at Northwestern University's Kellogg School of Management, explains the complex pricing and payment structures that affect pricing in the American biopharmaceutical market. *See* Garthwaite Decl. ¶¶ 13-17, ECF No. 1-1.[2]  But to understand the issues directly presented in this case, the Court does not need to make findings about all of those details.  Instead, it is sufficient to recognize that pharmaceutical products

---

[2] This declaration, and the other declarations cited herein, are filed as attachments to the Complaint.

generally pass through several different entities before reaching the patients who need them. Pharmaceutical manufacturers mainly sell their products to wholesalers. Wholesalers, in turn, sell those products to healthcare providers (such as hospitals, clinics, and doctors) and to pharmacies. And healthcare providers and pharmacies ultimately dispense the products to patients, and receive payment for these products from the patients and the patients' insurance plans.

Each participant in this multi-layered distribution system pays a different amount for those products. Determining the price at which manufacturers will sell to wholesalers starts with the drug's Wholesale Acquisition Cost (or "WAC"). Federal law defines WAC as "the manufacturer's list price" to "*wholesalers* or direct purchasers," "not including prompt pay or other discounts, rebates or reductions in price." 42 U.S.C. § 1395w-3a(c)(6)(B) (emphasis added). In most U.S. product markets, that wholesale price would be significantly below the retail price that consumers pay for the product, because of markups introduced by other participants in the distribution system. In the U.S. pharmaceutical market, however, the opposite is true: WAC for a given product is almost always *higher*—often many times higher—than what patients will pay for that same product at the pharmacy or through their provider.

There are several reasons for this. One is that the amount paid for drugs may be reduced by rebates, discounts, and other offsetting payments by the manufacturer. As a result of those price concessions, the *net* cost to entities in the supply chain may be significantly lower than WAC. *See* Garthwaite Decl. ¶¶ 13-17.

The principal reason for the unusual relationship between wholesale and retail prices for pharmaceutical products, though, is the third-party payer system. In most cases, private insurance or a government health program pays a significant majority of the cost of a pharmaceutical product.

Meanwhile, the patient—the person to whom direct-to-consumer advertisements are addressed—typically makes only a comparatively small out-of-pocket payment.

The amount of this out-of-pocket payment is calculated differently for different patients. For most prescriptions, the amount depends on the patient's "co-payment" obligation, which is a fixed dollar amount that a patient may be required to pay (for example, if the plan includes three tiers of covered drugs, the co-pay for each tier might be $15, $25, and $45, respectively). Alternatively, the out-of-pocket amount may depend on a "co-insurance" arrangement, in which the patient pays for a fixed percentage of the drug's cost (with that percentage again sometimes varying for different drugs). And finally, some patients have a "deductible," which is an out-of-pocket amount the patient will have to pay over the course of a year before his or her insurer takes responsibility for the cost of care. These different factors are sometimes combined, as when a patient is first required to satisfy her deductible, and then owes only a co-insurance obligation for the remainder of the year. *See* Garthwaite Decl. ¶¶ 18-20.

Because of these considerations, for the vast majority of patients in the United States, the out-of-pocket cost of a pharmaceutical product is a small fraction of WAC. Indeed, for more than 120 million Americans whose drugs require only fixed co-payments or are covered completely by their insurer—virtually all of the 65 million Americans on Medicaid, and roughly half of those with private insurance—there is no connection between out-of-pocket cost and a product's WAC. *See id.* ¶¶ 22, 25-27, 34-35.

Even for Americans whose out-of-pocket costs depend on co-insurance, advertised pharmaceutical products still generally cost much less than WAC. For example, in Medicare Part B, which generally covers physician-administered drugs (such as the drugs used in chemotherapy), the maximum co-insurance amount is 20%—and that percentage is generally applied to a figure

that is itself below WAC.  *See id.* ¶ 41.  In Medicare Part D, meanwhile, the maximum co-insurance level is 50%, with branded drugs on preferred formulary tiers having a maximum co-insurance of 25% and specialty drugs having a maximum co-insurance of 33%.  *See id.* ¶ 46.  Determining which of those tiers a particular drug will fall in requires a patient to consult her Part D plan, but the patient's out-of-pocket cost for the product will be *at most* half of the wholesale price, and often substantially less.  Indeed, because co-insurance in Part D plans is applied to the price negotiated between the pharmacy and the wholesaler (which itself is generally less than WAC), even non-preferred branded drugs typically require out-of-pocket costs of less than 50% of WAC. *See id.* ¶¶ 46-47.

Deductibles have little effect on this for most transactions.  The approximately 65 million Americans covered by Medicaid have no deductible applicable to their prescription drugs.  *See id.* ¶ 35.  Similarly, of the roughly 156 million Americans with employer-sponsored health insurance, just 10% have plans with deductibles applicable to prescription drugs.  *See id.* ¶ 26.  For Americans enrolled in Medicare Part B, the deductible is just $185 in 2019.  *See id.* ¶ 41.  And for the roughly 43 million Americans with Medicare Part D plans, the maximum deductible is $415 in 2019, an amount that would be fully satisfied over the course of the year by a single monthly prescription of $35 or more.  If those patients have other prescriptions, or prescriptions for drugs that cost significantly more than $35, the average amount they pay for those drugs will be less than half of WAC (and often much lower than that).  *See id.* ¶ 43.

Finally, even among the relatively small percentage of Americans who do not have health insurance that covers pharmaceutical products, out-of-pocket costs are still often below WAC. This is because most pharmaceutical manufacturers offer programs to provide discounts or free products for need-based eligible consumers.  Indeed, the manufacturers of every one of the 20

drugs with the highest direct-to-consumer advertising spending during 2016 offer assistance programs that make medication available at no cost to eligible consumers, with eligibility criteria encompassing a substantial portion of the middle class.  *See id.* ¶ 52.

In sum, the vast, vast majority of pharmaceutical prescriptions filled each year in the United States are sold to patients at an amount that is below—and typically far below—WAC.

## III.    THE COMPELLED WAC DISCLOSURE RULE

Against the backdrop of this complex distribution and pricing system, HHS announced in May 2018 that it was considering new disclosure requirements for direct-to-consumer advertising as part of its "Blueprint to Lower Drug Prices and Reduce Out-of-Pocket Costs."  *HHS Blueprint to Lower Drug Prices and Reduce Out-of-Pocket Costs*, 83 Fed. Reg. 22,692 (May 16, 2018).  In describing a series of actions that "HHS may undertake . . . to the extent permitted by law," HHS indicated that it would "[c]all on the FDA to evaluate the inclusion of list prices in direct-to-consumer advertising."  *Id.* at 22,694-95.

In response, commentators pointed to the FDA's longstanding position that it has no authority under the FDCA to require drug price disclosures in direct-to-consumer advertising.  *See, e.g.*, PhRMA, *Comment Letter on HHS Blueprint to Lower Drug Prices and Reduce Out-of-Pocket Costs* at 120 (July 16, 2018), https://www.regulations.gov/contentStreamer?documentId=CMS-2018-0075-2808&attachmentNumber=1&contentType=pdf ("We do not believe that FDA currently has the statutory authority to impose such a requirement or that such a requirement would be constitutional.").  Ultimately, HHS settled on a backup plan:  It turned to the Centers for Medicare & Medicaid Services (CMS)—the agency within HHS responsible for administering the Medicare and Medicaid programs.

In its Notice of Proposed Rulemaking, HHS acknowledged that "Congress has not explicitly provided HHS with authority to compel the disclosure of list prices to the public."

*Medicare and Medicaid Programs; Regulation to Require Drug Pricing Transparency*, 83 Fed. Reg. 52,789, 52,791 (proposed Oct. 18, 2018).  HHS therefore sought to rely on more generalized regulatory authorizations.  It invoked two statutory provisions that authorize the Secretary to make regulations "necessary" for the "administration of" Medicare and Medicaid.  *See id.*  The first, Section 1102(a) of the Social Security Act, authorizes the Secretary to issue "such rules and regulations, not inconsistent with this Act, as may be necessary to the efficient administration of the functions . . . under this Act."  The second, Section 1871(a) of the Social Security Act, authorizes the Secretary to "prescribe such regulations as may be necessary to carry out the administration of the insurance programs under" the subchapter of the Social Security Act that establishes the Medicare program.  *See id.* at 52,790.[3]

Invoking these general provisions regarding the "administration of" government health programs, HHS proposed to adopt a new requirement applicable to all direct-to-consumer advertisements of pharmaceutical products airing on television in the United States, with several minor exceptions.  Under the proposed rule, every television advertisement for a prescription drug or biological product that is eligible for reimbursement under Medicare or Medicaid and has a WAC over $35 a month would be required to contain a statement conforming to the following HHS-prescribed script:  "The list price for a [30-day supply of] [typical course of treatment with] [name of prescription drug or biological product] is [insert list price].  If you have health insurance that covers drugs, your cost may be different."  *Id.* at 52,794 (bracketed statements in original). And manufacturers would be required to use a product's WAC as the "list price" identified in the

---

[3] Section 1102(a) of the Social Security Act is codified at 42 U.S.C. § 1302(a).  Section 1871(a) is codified at 42 U.S.C. § 1395hh(a).

advertisement.  *See id.* (For that reason, Plaintiffs refer to the rule as the "Compelled WAC Disclosure Rule.")

The comment period on the Notice of Proposed Rulemaking closed in December 2018. More than five months later, HHS announced that it had decided to finalize the Compelled WAC Disclosure Rule "as proposed, with minor technical modifications." 84 Fed. Reg. at 20,750.  HHS adopted additional requirements that "[t]he textual statement . . . be presented at the end of an advertisement in a legible manner, meaning that it is placed appropriately and is presented against a contrasting background for sufficient duration and in a size and style of font that allows the information to be read easily." 42 C.F.R. § 403.1203.  CMS also indicated that manufacturers will be allowed "to provide an up-to-date competitor product's [WAC]" in their drug advertisements, so long as, in doing so, they comply with "applicable FDA requirements." 84 Fed. Reg. at 20,749.

In finalizing the Rule, HHS responded to several commenters who had expressed concern that its authority under the Social Security Act to administer the Medicare and Medicaid programs does not empower HHS to broadly regulate direct-to-consumer pharmaceutical advertisements. HHS argued that the Rule is authorized as "necessary" to the efficient "administration" of the Medicare and Medicaid programs because it is intended to "help improve the efficiency of [those] programs by reducing wasteful and abusive increases in drug and biological product list prices." *Id.* at 20,733, 20,736.  HHS hoped it will do so in two ways.  "First," HHS asserted, "it will provide manufacturers with an incentive to reduce their list prices by exposing overly costly drugs to public scrutiny."  *Id.* at 20,733.  And "[s]econd," HHS said "it will provide some consumers with more information to better position them as active and well-informed participants in their health care decision-making."  *Id.*  But while HHS "believe[d] that this rule may provide a moderating force to counteract prescription drug or biological product price increases" by "improving awareness

17

and allowing the general public to signal in some cases that prescription drug or biological product prices have risen beyond their willingness to pay," it conceded that "[w]e lack data to quantify these effects." *Id.* at 20,756.[4]

HHS also responded to the numerous commenters who had argued that the Rule would violate the First Amendment.  It insisted that the Rule should be analyzed under and satisfies the somewhat more deferential standard established by the Supreme Court in *Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio*, 471 U.S. 626 (1985).  84 Fed. Reg. at 20,744.  The statement that the Compelled WAC Disclosure Rule requires manufacturers to include in their advertisements, HHS maintained, "is undeniably a truthful statement of objective fact."  *Id.* Requiring such "disclosures of factual and uncontroversial information," HHS argued, does not violate the First Amendment.  *Id.*

At the same time—and without appearing to recognize the inconsistency in its position— HHS acknowledged that the supposedly "truthful statement of objective fact" required by the Rule

---

[4] That concession reflected a retreat from HHS's earlier position in the Notice of Proposed Rulemaking.  There, HHS had tethered its hopes for reduced prices to two sources: an article from 1976 by John Cady, *see* John F. Cady, *An Estimate of the Price Effects of Restrictions on Drug Advertising*, 44 Econ. Inquiry 493 (1976), and a Congressional Research Service (CRS) report, *see* Andrew Austin & Jane G. Gravelle, CRS, *Does Price Transparency Improve Market Efficiency? Implications of Empirical Evidence in Other Markets for the Health Sector* 46 (2007) (hereinafter "CRS Report").  Commenters had pointed out, however, that neither source supported HHS's hypothesis.  The Cady article focused only on restrictions governing retail-price advertising by pharmacies, not WAC advertising by pharmaceutical manufacturers.  *See* Inst. for Policy Integrity, *Comment Letter on Proposed Rule for Medicare and Medicaid Programs: Drug Pricing Transparency* (Dec. 17, 2018), https://www.regulations.gov/contentStreamer?documentId=CMS-2018-0123-0085&attachmentNumber=1&contentType=pdf.  It concluded that regulations banning pharmacies from competing on the basis of retail price decreased competition, but it did not suggest that disclosure of WAC would improve competition along *any* price dimension (wholesale, retail, or otherwise).  Similarly, although the CRS Report concluded that price-based advertising typically leads to lower retail prices, it distinguished between voluntary and mandatory price disclosures and cautioned against applying the conclusions of the Cady article to advertising by pharmaceutical *manufacturers*.  CRS Report at 39, 41.

might leave consumers with a decidedly *un*truthful impression.  Numerous medical professional

and patient organizations—including the American Heart Association, the American College of

Obstetricians and Gynecologists, the Cancer Support Community, the AIDS Institute, and the

American Academy of Neurology, to name only a few—had argued that mandatory WAC

disclosure would be "misleading, cause distress,"[5] and cause patients to "forgo care out of fear of

being responsible for paying" WAC.[6]  As the National Alliance on Mental Illness put it, the

required statement was likely to "give viewers the misleading impression that they will be required

to pay the full price to obtain a medication, rather than a co-pay or coinsurance required by their

health plan."[7]  HHS ultimately agreed, recognizing that one of the "Direct Costs" of the Rule is

that "[c]onsumers might believe they are being asked to pay the list price rather than a co-pay or

co-insurance and wonder why they are paying so much when they already paid a premium for their

drug plan.  This could discourage patients from using beneficial medications, reduce access, and

potentially *increase* total cost of care."  84 Fed. Reg. at 20,756 (emphasis added).  Yet rather than

investigating the validity of these arguments, HHS simply stated, once again, that "[w]e lack data

to quantify these effects."  *Id.*

---

[5] Cancer Support Cmty., *Comment Letter on Proposed Rule for Medicare and Medicaid Programs: Drug Pricing Transparency* 2 (Nov. 17, 2018), https://www.regulations.gov/contentStreamer?documentId=CMS-2018-0123-0038&attachmentNumber=1&contentType=pdf.

[6] Am. Acad. of Neurology, *Comment Letter on Proposed Rule for Medicare and Medicaid Programs: Drug Pricing Transparency CMS* (Dec. 5, 2018), https://www.regulations.gov/contentStreamer?documentId=CMS-2018-0123-0056&attachmentNumber=1&contentType=pdf.

[7] Nat'l All. on Mental Illness, *Comment Letter on Proposed Rule for Medicare and Medicaid Programs: Drug Pricing Transparency* 1 (Dec. 17, 2018), https://www.regulations.gov/contentStreamer?documentId=CMS-2018-0123-0112&attachmentNumber=1&contentType=pdf.

Summing up the costs and benefits of the Rule, HHS acknowledged that there are *no* "Quantified Benefits," while the "Quantified Costs" of the rule will be at least $23 million over the course of a five-year period, taking into account just the expense of modifying advertisements and ensuring compliance with the rule.  *Id.* at 20,757.[8]  That assessment did not include what HHS called "Non-quantified Costs" as to which there was a "Lack of Data," including "Costs based [on] potential changes in patient and provide[r] behavior."  *Id.*  Nevertheless, the agency chose to finalize the Rule, pointing to a single "Non-quantified Benefit[]": "Improved transparency for prescription drug and biological product prices."  *Id.*  It set the Rule to take effect on July 9, 2019. *See id.* at 20,732.

## LEGAL STANDARD

The Administrative Procedure Act authorizes reviewing courts to stay the effective date of challenged agency actions pending judicial review.  5 U.S.C. § 705.  This Court evaluates motions to stay agency actions "under the same standards used to evaluate requests for interim injunctive relief."  *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010); *see also Nken v. Holder*, 556 U.S. 418, 426 (2009) (finding that the "traditional stay factors" govern the decision whether to grant a stay pending judicial review).  Those standards require courts to weigh "four factors, taken together":  (1) "likely success on the merits," (2) "likely irreparable harm in the absence of preliminary relief," (3) "a balance of the equities" that considers any harm

---

[8] That estimate is itself wildly unrealistic.  Direct-to-consumer advertisements are already tightly organized to communicate the manufacturer's message about how the treatment in question may save or improve viewers' lives in an accurate and effective manner, while complying with the pre-existing FDA regulations about what such advertisements must and must not contain.  Adding an additional mandatory disclosure, which introduces an entirely new topic to the advertisement, would in many cases require altering those advertisements in material ways.  HHS's suggestion that this entire modification can be made in 15 minutes per advertisement—10 minutes of time by "administrative support staff," and 5 minutes by "marketing managers," 84 Fed. Reg. at 20,754—has no basis in reality.

to the opposing party and (4) the extent to which interim relief would be in "accord with the public interest." *Pursuing Am.'s Greatness*, 831 F.3d at 505.

## ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.   THE COMPELLED WAC DISCLOSURE RULE EXCEEDS HHS'S AUTHORITY UNDER THE SOCIAL SECURITY ACT

"It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Here, HHS has exceeded its authority because neither the Social Security Act nor any other statute permits it to require pricing disclosures in pharmaceutical advertisements.

### 1.   *Congress Has Spoken Clearly—And Imposed Clear Limits—When It Has Intended To Authorize HHS To Regulate Advertising*

Sometimes, Congress does intend for HHS to regulate advertising. When that is the case, it says so clearly. It also imposes clear limits.

The best example is the FDCA. In 1962, when Congress granted regulatory authority over prescription drug advertisements in the FDCA, it was explicit. It detailed exactly what kind of information manufacturers have to include, and authorized the Secretary of what is now HHS to enforce and administer those requirements. *See* Drug Amendments of 1962 § 131, Pub. L. No. 87-781, 76 Stat. 780, 791-92 (1962) (current version at 21 U.S.C. § 352(n)). The FDCA provided that advertisements need to contain true statements of (1) the drug's "established name"; (2) "the formula showing quantitatively each ingredient of" the drug as required by another provision of the FDCA; and (3) "such other information in brief summary relating to side effects, contraindications, and effectiveness as shall be required" by regulation. *Id.* Congress also specified that "except in extraordinary circumstances, no regulation issued under this paragraph shall require prior approval by the Secretary of the content of any advertisement." *Id.* at 792.

Congress spoke just as carefully in 2007 when it again amended the FDCA and authorized the Secretary to pre-review prescription drug television advertisements.  *See* Food and Drug Administration Amendments Act of 2007 § 503B, Pub. L. No. 110-85, 121 Stat. 823, 939 (2007) (current version at 21 U.S.C. § 353c).  Those amendments provided that HHS "may require" television advertisements to be submitted for pre-review "not later than 45 days before" they air. *Id.*  But HHS was authorized only to make certain "*recommendations* with respect to information included in the label of the drug."  *Id.* (emphasis added).  And unless the advertisement would be false or misleading without a specific disclosure about a serious health risk, the amendments provided that HHS has "[n]o authority to require changes"; Congress specified that the pre-review provision "does not authorize the Secretary to make or direct changes in any material submitted." *Id.*  It is thus unsurprising that, as discussed above, the FDA has consistently acknowledged that it lacks authority to require pricing disclosures in television drug advertisements.  *See, e.g.*, 40 Fed. Reg. at 58,794 ("The decision to engage in public disclosure of prescription prices is not for the Food and Drug Administration to make.");  *cf. Experimental Study of the Impact of Coupons Embedded in Direct-to-Consumer Prescription Drug Print Advertisements on Consumer Perceptions of Product Risks and Benefits*, 73 Fed. Reg. 76,034, 76,035 (Dec. 15, 2008) ("While the Federal Food, Drug, and Cosmetic Act (the act) provides FDA with authority to regulate prescription drug advertisements that are false or misleading, the act does not provide FDA with the authority to regulate the pricing of prescription drugs.").

Congress has also addressed regulation of advertising by HHS outside the FDCA.  There, too, Congress has circumscribed its grant of authority narrowly.  In 1997, Congress amended the Social Security Act—the statute under which HHS purports to be acting here—to allow HHS to "disapprove[] the distribution of" marketing materials prepared by private Medicare Advantage

organizations in order to market their insurance plans to Medicare-eligible beneficiaries. *See* Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251, 285 (1997) (current version at 42 U.S.C. § 1395w-21(h)).  And again, Congress paired that express grant of authority with express limitations, establishing a timetable for HHS's review of these marketing materials and specifying the standards that HHS must employ. *See id.*  HHS has 45 days to review the materials under standards specified in the Act, and is required to disapprove them (or have them corrected) if they are "materially inaccurate or misleading or otherwise ma[de] a material misrepresentation." *Id.*

HHS's authority to regulate television advertisements—under *any* of the statutes it administers—is thus highly circumscribed.  The statutory provisions that specifically authorize HHS to regulate advertising let it address only particular aspects of advertising, and no more.

### 2. *HHS Cannot Expand Its Authority Over Advertising By Invoking Its Ability To Promulgate Regulations Necessary For The Administration Of The Medicare And Medicaid Programs*

HHS does not contend that any of those targeted statutory provisions authorize the rulemaking it has engaged in here.  To the contrary, it concedes that "Congress has not explicitly provided HHS with authority to compel the disclosure of list prices to the public."  83 Fed. Reg. at 52,791.  But having announced with fanfare its intent to regulate in this area, HHS did not let that detail stand in the way.  HHS instead invoked its general authority to promulgate regulations for the "efficient" "administ[ration]" of the Medicare and Medicaid programs as a basis for its unprecedented new rule mandating disclosure of WAC in pharmaceutical advertisements to the general public—even though "neither section 1102 nor section 1871 of the Social Security Act specifically references prescription drugs or biological products, their prices, or advertisements." 84 Fed. Reg. at 20,736.

Courts have long patrolled agency actions for precisely this sort of bureaucratic end-around.  As the D.C. Circuit has explained, an agency "cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions of [the agency] in a particular area."  *Nat'l Mining Ass'n v. U.S. Dep't of the Interior*, 105 F.3d 691, 694 (D.C. Cir. 1997) (quoting *Am. Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995)).  Here, in the FDCA, Congress gave HHS express authority to regulate *some* aspects of pharmaceutical advertising, but that authority is limited to requiring disclosure of things like the "established name" of the advertised product, the "formula showing quantitatively each ingredient of such drug to the extent" required for product labels, and information related to "side effects, contraindications, and effectiveness."   21  U.S.C.  § 352(n).   That authorization conspicuously does not extend to mandating price disclosures, and HHS cannot rely on its "general authority" under an entirely different statute (the Social Security Act) "to expand the specific but more limited" authority conferred by the FDCA.  *Teva Pharm. Indus. Ltd. v. Crawford*, 410 F.3d 51, 55 (D.C. Cir. 2005); *see also Fed. Mar. Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 744 (1973) ("In light of these specific grants of . . . authority, we are unwilling to construe the ambiguous provisions. . . to serve this purpose [of expanding authority]—a purpose for which it obviously was not intended."); *Am. Petroleum*, 52 F.3d at 1119 (a "general grant of rulemaking power . . . cannot trump specific" statutory provisions); *cf. Gonzales v. Oregon*, 546 U.S. 243, 262 (2006) ("It would be anomalous for Congress to have so painstakingly described the Attorney General's limited authority . . ., but to have given him, just by implication, authority to" reach the same end.).

The inappropriateness of HHS's attempt to circumvent the limits on its specific authorities is especially obvious here, where the regulation it has adopted is so far removed from the purpose

24

of the general provisions on which it relies.  As discussed, Sections 1102 and 1871 give HHS authority to adopt regulations "necessary" for the "administration" of the Medicare and Medicaid programs.  To be sure, those provisions give HHS significant flexibility in deciding what rules are appropriate for managing Medicare and Medicaid.  But it is implausible to suggest that the unprecedented regulation here—applicable industry-wide to pharmaceutical television advertisements that make no mention of Medicare or Medicaid, and justified in large part by its supposed effects on consumers with *private* insurance, *see*, *e.g.*, 83 Fed. Reg. at 52,790—is actually "necessary" to the "administration" of Medicare and Medicaid.

The ordinary meaning of "necessary" is "Indispensable, vital, essential; requisite." *Necessary* (*adj.*), Oxford English Dictionary, https://www.oed.com/view/Entry/125629 (last visited June 14, 2019).  Not even HHS, for all its assertions of "broad authority to regulate for the efficient administration of the Medicare and Medicaid programs," 84 Fed. Reg. at 20,737, claims that this regulation is "vital" for that objective.  HHS instead focuses its efforts on showing that the regulation is "reasonably related to program purposes." *Id.*  But even judged by that watered-down standard, HHS's showing falls short.  It depends on the idea that HHS can adopt any regulation that it believes will reduce healthcare costs across the entire economy, because there is a "nexus" between doing so and the statutory goal of "minimiz[ing] unreasonable expenditures" in administering Medicaid and Medicare. *Id.*  If endorsed here, that breathtaking conception of HHS's authority to administer the Medicare and Medicaid programs will allow HHS to regulate virtually the entire healthcare industry, and much more besides—from limiting medical school tuition to establishing direct price controls to prohibiting direct-to-consumer advertising altogether—as long as HHS speculates it might have an indirect impact on healthcare costs that, in turn, might reduce costs for the Medicaid and Medicare programs.

Courts have refused to read general rulemaking provisions like Sections 1102 and 1871 of the Social Security Act to give an agency that sort of "*carte blanche* authority to promulgate any rules, on any matter." *Nat'l Mining Ass'n*, 105 F.3d at 694 (quoting *In re Permanent Surface Mining Regulation Litig.*, 653 F.2d 514, 523 (D.C. Cir. 1981) (en banc)). And for good reason: If Congress had anything so grand in mind, it would have said so directly. *See Util. Air Regulatory Grp.*, 573 U.S. at 324 ("We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000))).

This judicial skepticism of administrative claims to have found "elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), is at its peak when—as here—the supposed elephant has gone unnoticed for decades. As the Supreme Court has put it, "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy,' we typically greet its announcement with a measure of skepticism." *Util. Air Regulatory Grp.*, 573 U.S. at 324 (citation omitted).

The courts' demand for a clear congressional statement before acquiescing in an agency's new and expansive assertion of authority serves multiple purposes. It is, as discussed, a good measure of likely congressional intent, since it is unlikely that Congress would confer broad and important authority without explicitly saying so—or that this power would go unnoticed for decades if it was in the statute from the get go. *See King v. Burwell*, 135 S. Ct. 2480, 2488-89 (2015) ("[H]ad Congress wished to assign that [extraordinary] question to an agency, it surely would have done so expressly."); *Util. Air Regulatory Grp.*, 573 U.S. at 324. But it also ensures political accountability, and avoids unconstitutional delegations of vast lawmaking authority without a sufficiently "intelligible principle" to guide the exercise of that delegation. *See Panama*

26

*Refining Co. v. Ryan*, 293 U.S. 388, 429-30 (1935).  If Congress truly intends to delegate expansive regulatory authority to an unelected executive branch official, then it must provide guidelines for the exercise of that authority so that courts can "ascertain whether the will of Congress has been obeyed" in the exercise of that authority.  *United States v. E.I. Dupont de Nemours & Co.*, 432 F.3d 161, 167 (3d Cir. 2005) (citation omitted).  Where those guidelines are absent, it is safest and most respectful to assume that Congress did not believe it was delegating the sort of expansive authority that would make them constitutionally necessary.  Otherwise, there would be a serious question about the constitutionality of the enactment—particularly where the asserted authority raises significant First Amendment issues.  *See Nat'l Cable Television Ass'n v. United States*, 415 U.S. 336, 342 (1974) (explaining the Court's practice of interpreting delegations "narrowly to avoid constitutional problems"); *Mot. Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 805 (D.C. Cir. 2002) (general statutory authority must be interpreted narrowly where First Amendment interests are implicated).

Here, reading Sections 1102 and 1871 of the Social Security Act to give HHS authority to regulate everything that might conceivably affect healthcare costs in the Medicare and Medicaid programs—including, but not limited to, mandatory price disclosures in television advertisements—would raise just such a constitutional question.  As discussed above, when Congress has authorized HHS to regulate advertising in the past, it has done so expressly and imposed specific limits on that authority.  Both of those things are absent here:  Congress has made no express grant of authority to require price disclosures in pharmaceutical advertisements, and has imposed no intelligible limits on the scope of such authority.  The obvious conclusion is that Congress did not intend to convey the authority in the first place.  If HHS wants that new power, it can go back to Congress and ask for it.  Indeed, both before and after issuance of the Compelled

WAC Disclosure Rule, some members of Congress proposed amendments that would expressly authorize HHS to regulate in this area. *See* S. Amend. No. 3964, 164 Cong. Rec. S5871, S5904, 115th Cong. 2d Sess. (daily ed. Aug. 23, 2018); S. 1437, 165 Cong. Rec. S2775, S2791, 116th Cong. 1st Sess. (daily ed. May 13, 2019). None of that legislation has been enacted. And without such congressional action, this Court should not allow HHS to convert its general authority to administer the Medicare and Medicaid programs into an all-purpose power to regulate the entire healthcare sector and require whatever steps it thinks might reduce costs. Whether to grant that authority, and what limitations to impose on it, are questions that *Congress* must decide in our constitutional system.

## B. THE COMPELLED WAC DISCLOSURE RULE VIOLATES THE FIRST AMENDMENT

Even if Congress eventually were to authorize HHS to require *some* form of price disclosure in pharmaceutical advertisements, the specific disclosure mandated by the Compelled WAC Disclosure Rule would still violate the First Amendment.

### 1. *The Compelled WAC Disclosure Rule Cannot Survive Intermediate Scrutiny*

In general, the government can no more compel people to speak than it can bar them from speaking, *see Wooley v. Maynard*, 430 U.S. 705, 715-16 (1977), and the government bears a heavy burden to justify laws compelling speech, even in the commercial arena. In recent years, the Supreme Court has held that where such compelled speech mandates apply only to certain speakers or certain types of messages, that sort of speaker- and content-based discrimination must be evaluated under heightened scrutiny. *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011); *see also Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227, 2231 (2015). At the very least, such laws are subject to intermediate scrutiny under the Court's decision in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 566 (1980).

To satisfy intermediate scrutiny, "the government must affirmatively prove that (1) its asserted interest is substantial, (2) the restriction directly and materially advances that interest, and (3) the restriction is narrowly tailored." *RJ Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1212 (D.C. Cir. 2012), *overruled on other grounds by Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) (en banc); *see also, e.g.*, *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 187-88 (1999) (noting that under *Central Hudson*, a court "asks whether the speech restriction directly and materially advances" a "substantial" governmental interest and whether the government can "demonstrate narrow tailoring of the challenged regulation to the asserted interest"). HHS cannot carry that burden, for several reasons.

> *a.*      *HHS Cannot Show That The Compelled WAC Disclosure Rule Directly And Materially Advances A Substantial Government Interest*
>
>      (1)      The Rule Will Undermine, Rather Than Further, Any Government Interest In Accurate Consumer Understandings Of Pharmaceutical Prices

In the preamble announcing the finalization of the Compelled WAC Disclosure Rule, HHS asserts that the Rule has two objectives. The first is to "improve the CMS customer experience by providing transparency into drug prices." 84 Fed. Reg. at 20,754. HHS claims that "this rule provides Medicare and Medicaid beneficiaries with important information—namely, an anchor price—they can use to make informed decisions about their care." *Id.* at 20,737. Because HHS is requiring disclosure of a wholesale price that is wildly unrepresentative of—and in most cases irrelevant to—the costs patients actually bear for prescription drugs, however, HHS cannot show that the Rule will "directly and materially advance[]" the stated objective of transparency and informed decisionmaking. *Greater New Orleans Broad.*, 527 U.S. at 188. Indeed, the Rule will *undermine* it.

29

As the FTC has explained, "[m]any members of the purchasing public believe that a manufacturer's list price . . . is the price at which an article is generally sold." 16 C.F.R. § 233.3(a). By requiring manufacturers to use the phrase "list price" to describe the price they are disclosing in direct-to-consumer pharmaceutical advertisements, HHS will cause members of the public, including Medicaid and Medicare beneficiaries, to believe that the disclosed price is the amount they will actually pay at the pharmacy or through their provider. *Id.* But as discussed above, *see supra* at 9-15, that understanding is incorrect because WAC is defined by federal statute as a gross price to *wholesalers*, and vastly exceeds the out-of-pocket costs for most patients. Regardless of a drug's WAC, the maximum out-of-pocket cost for virtually all of the approximately 65 million Americans on Medicaid is $8. Likewise, for drugs covered by Medicare Part B, Medicare beneficiaries will generally pay at most 20% of WAC—and often even less—once they have satisfied their $185 deductible. And patients with a Medicare Part D plan who have met their deductible will oftentimes owe only a small co-pay that bears no relation to WAC; even when they have a co-insurance obligation because the drug in question is on a non-preferred formulary, that amount will be at most half of the drug's wholesale cost, and just a third for drugs with a WAC over $670. Describing WAC as simply a "list price" in direct-to-consumer advertisements, therefore, will do more to *confuse* those Medicaid and Medicare beneficiaries than it will to "improve the CMS customer experience." 84 Fed. Reg. at 20,754.

The evidence bears this out. Dr. Ravi Dhar, the George Rogers Clark Professor of Management and Marketing at the Yale School of Management, explains in his accompanying declaration that providing WAC in direct-to-consumer advertisements will not lead to more informed choices, and instead will mislead consumers into overestimating their actual out-of-pocket costs. *See* Dhar Decl. ¶¶ 14-34, ECF No. 1-2. Researchers have long understood that when

consumers are presented with an "anchor" price, that anchor has a strong influence on consumer expectations about expected cost even if the anchor was originally selected arbitrarily. *See id.* at ¶¶ 19-21. Providing a misleading anchor, therefore, undermines the process of informed decision-making and may actually prevent consumers from seeking out the *accurate* information that they might otherwise rely on.

Seeking to defend the Rule, HHS suggests that knowing a drug's WAC will "provide [a patient] with . . . a reference comparison to be used when making decisions about therapeutic options," even if it does not actually tell the patient what his out-of-pocket cost would be. 84 Fed. Reg. at 20,735. Its premise is that products with a higher WAC will also have a higher out-of-pocket cost. But that premise is incorrect, too. For the approximately 65 million Americans on Medicaid, for example, the out-of-pocket cost for a drug with a WAC of $400 will often be *identical* to the out-of-pocket cost for a drug with a WAC of $2,400. Indeed, depending on formulary placement, the $400 WAC drug could even cost the beneficiary a few dollars *more* than the $2,400 WAC drug. And even for the smaller number of Americans with prescription drug coverage through Medicare Part D that rely on co-insurance, there are circumstances in which a drug with a higher WAC is on a preferred tier of the formulary while a competitor drug with a lower WAC is on a non-preferred tier. *See* Garthwaite Decl. ¶ 54. If the Part D beneficiary pays 20% co-insurance for drugs on the preferred tier and 50% co-insurance for drugs on the non-preferred tier, a preferred drug with a WAC of $10,000 might well cost the beneficiary less in out-of-pocket costs than a non-preferred drug with a WAC of $5,000.[9] HHS's recognition that

---

[9] The Compelled WAC Disclosure Rule will further confuse viewers because of its insistence that manufacturers calculate a WAC figure for a 30-day supply or "typical course of treatment." For many products, there *is* no "typical" course of treatment, much less one that can be identified as being given every 30 days—dosage amounts, and thus prices, depend on a variety of factors

consumers will use WAC as "a reference comparison to be used when making decisions about therapeutic options," then, just *confirms* that the Rule will mislead the very people it is supposed to "inform[]."  84 Fed. Reg. at 20,735.  They will believe a higher WAC means a higher out-of-pocket cost, when in fact that often is not true.

This distorting effect will also likely inhibit those beneficiaries from considering and discussing with their doctors potential *changes* in therapy, even where doing so would be better for their health without affecting their bottom line.  A Medicare Part D patient who is currently paying $200 a month for a prescription to care for her high blood pressure, for example, might see an advertisement for a new treatment for that condition that could address some of the side effects she has been experiencing.  If the advertisement indicates that the "list price" for this new drug is $1,000, however, she would likely consciously or unconsciously compare that disclosed figure to the other figure she knows—the $200 she spends on her prescription every month.  If dealing with her side effects is not worth $800 more a month, she may never ask her doctor about the possibility of switching—even if, in reality, her out-of-pocket cost would be precisely the same because she would owe just a 20% co-insurance obligation for the advertised product.

Remarkably, HHS appears to concede all this.  It recognizes that because of the formulation of the mandated statement, "[c]onsumers might believe they are being asked to pay the list price rather than a co-pay or co-insurance and wonder why they are paying so much when they already paid a premium for their drug plan.  This could discourage patients from using beneficial

---

including gender, age, weight, and disease state, such that no particular dosage or price would apply to a majority of patients.  *See* Marek Decl. ¶¶ 14-16, ECF No. 1-5.

medications, reduce access, and potentially increase total cost of care." 84 Fed. Reg. at 20,756. And it further acknowledges that "[w]e lack data to quantify these effects." *Id.*[10]

HHS's acknowledgment that the Compelled WAC Disclosure Rule may actually *undermine* consumer understandings about pharmaceutical pricing, and that it lacks evidence about the Rule's net effect in that regard, means that HHS cannot establish that the Rule will directly and materially advance its transparency-promoting interest under *Central Hudson*. As the D.C. Circuit has recognized, the government's burden in showing that a speech mandate will directly and materially advance its asserted interest is substantial: It must show, with actual evidence, "that the measure . . . would 'in fact alleviate' the harms it recited 'to a material degree.'" *Nat'l Ass'n of Mfrs.*, 800 F.3d at 526-27 (citation omitted); *see also Am. Meat Inst.*, 760 F.3d at 26 (requiring "evidence of a measure's effectiveness").

In *National Association of Manufacturers*, for example, the D.C. Circuit considered regulations issued by the Securities and Exchange Commission that required companies to

---

[10] By admitting that it "lack[s] data to quantify these effects," 84 Fed. Reg. at 20,756, HHS seems to recognize the insufficiency of the three-page study that it cites elsewhere in the preamble. That recognition is appropriate. In that study, consumers who viewed advertisements for a hypothetical diabetes drug with a "price" of $15,500 for a 30-day supply were asked what they believed they would have to pay out-of-pocket for the drug. *See* Jace B. Garrett et al., *Consumer Responses to Price Disclosure in Direct-to-Consumer Pharmaceutical Advertising*, 179 JAMA Internal Med. 435, 437 (2019). Responses varied widely, but on average respondents expected they would have to pay $2,787.08. *Id.* (Table 2). Moreover, even when they were told that "eligible patients may be able to get Mayzerium for as little as $0 per month," respondents still estimated (on average) that their out-of-pocket cost would be $1,355.39. *Id.*

HHS suggested that these estimates of out-of-pocket expense were "more accurate[]" than the $78 estimate that respondents made when they were not shown the WAC. But HHS provides no basis for that statement, and it is plainly incorrect for many Americans, as the background section above shows. Even the $78 estimate, for example, would be almost 10 times higher than the maximum out-of-pocket cost for any Medicaid beneficiary outside of Kentucky. Likewise, roughly half of Americans with private insurance have plans that require only co-pays for drugs; their costs would be much closer to $78 than to $2,787 or even $1,355. And even for Americans on Medicare who pay co-insurance, the out-of-pocket cost for Mayzerium would be just $775 by the time they filled their second prescription. *See* Garthwaite Decl. ¶ 50.

describe their products as not "conflict free" unless they could confirm that the minerals used in those products did not originate in certain covered countries.  800 F.3d at 547 (citation omitted) (appendix to 2015 panel opinion setting out description of regulatory regime).  Congress had held hearings on whether such a disclosure requirement would help to address the government's interest in "ameliorat[ing] the humanitarian crisis in the [Democratic Republic of the Congo]," and during those hearings "the testimony went both ways."  *Id.* at 524-26 (first alteration in original).  Later— in an admission much like HHS's admission here—the SEC conceded that it was "unable to quantify any benefits of the forced disclosure regime itself," but adopted the rule anyway.  *Id.* at 526.  Reviewing that record, the D.C. Circuit held that the disclosure requirement was invalid, because the government had not "proven" that the rule would be effective "to the degree required under the First Amendment to compel speech."  *Id.* at 527.  The same thing is true here.

> (2)    HHS Has Acknowledged It Cannot Show The Compelled WAC Disclosure Rule Will Directly And Materially Reduce Costs To The Medicaid And Medicare Programs

Alongside its purported interest in increased transparency, HHS also asserts a second interest that it claims the Compelled WAC Disclosure Rule will further:  "[R]educing wasteful and abusive increases in drug and biological product list prices."  84 Fed. Reg. 20,733.

This second interest is closely tied to the first.  HHS hopes the Rule will accomplish its cost-saving purpose by "provid[ing] manufacturers with an incentive to reduce their list prices by exposing overly costly drugs to public scrutiny," *id.*, and "allowing the general public to signal in some cases that prescription drug or biological product prices have risen beyond their willingness to pay," *id.* at 20,756.  Put plainly, even though most Americans in most transactions pay far less than WAC for their prescriptions, HHS expects that it will be easier to inflame public opinion about the affordability of pharmaceutical products if people believe those products would cost them many times more than they actually would.  And because "consumers . . . may be deterred

from contacting their physicians about drugs or medical conditions" if they have been "intimidated and confused by high list prices," HHS evidently hopes that either utilization rates will fall or manufacturers will slash their products' WAC to avoid losing consumers to such confusion.  *Id.*

HHS has no *legitimate* interest, much less a *substantial* interest, in misleading consumers in this way, even if it could show that the overall effect would be to reduce the total cost of care. *See, e.g.*, *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 965-67 (9th Cir. 2009) (explaining that a State has no legitimate reason to force retailers to affix misleading labels on their products).  Under the First Amendment, HHS cannot force pharmaceutical manufacturers to read from a misleading script just because it believes that the general public will like the manufacturers less—and be less likely to buy their products—as a result.  *See Sorrell*, 564 U.S. at 578-79 (holding that the government cannot "tilt the public debate in a preferred direction" through regulations that "hamstring the opposition").

In any event, HHS has an additional problem beyond the illegitimacy of its method:  It again lacks evidence that the Compelled WAC Disclosure Rule will have the hoped-for effect. Indeed, it *admits* that it lacks the necessary evidence.  HHS indicates that "[w]hile we expect this rule to put downward pressure on the list prices of drugs, *we cannot quantify the level of this impact because there is not data or examples that we can use.*"  84 Fed. Reg. at 20,754 (emphasis added). Moreover, HHS acknowledges that even if "the list price would go down, it would not necessarily affect" actual net payment amounts for those drugs; instead, it might simply cause manufacturers to eliminate rebates, discounts, and other existing price concessions, leaving the *net* cost to Medicare and Medicaid the same.  *Id.* at 20,757.

That by itself is enough to foreclose HHS's reliance on cost-saving justifications.  And there is more.  HHS has also conceded that it lacks evidence that the Rule will reduce overall

spending in the Medicare and Medicaid programs *even if* it actually reduces net drug prices.  That is because one likely effect of the Rule is to "discourage patients from using beneficial medications [and] reduce access," since patients, "intimidated and confused by high list prices, may be deterred from contacting their physicians about drugs or medical conditions." *Id.* at 20,756.  That is bad for individual patients, of course, but it may also increase overall healthcare costs, because foregoing treatment in the short term can often result in the need for more intensive treatment in the long term.  HHS therefore admits that by dissuading patients from asking their doctors about potential treatments, the Compelled WAC Disclosure Rule could "potentially *increase* total cost of care" for the Medicare and Medicaid programs.  *Id.* (emphasis added).  And HHS again acknowledges that "[w]e lack data to quantify these effects." *Id.*

HHS has thus recognized that, at multiple links in the causal chain on which it relies, it lacks the necessary evidence "that the measure . . . would 'in fact alleviate' the harms it recite[s] 'to a material degree.'" *Nat'l Ass'n of Mfrs.*, 800 F.3d at 526-27 (citation omitted).  Indeed, HHS even acknowledges that the Rule could produce effects *opposite to* its stated objectives, by increasing confusion and cost of care.  Given that, the Compelled WAC Disclosure Rule cannot satisfy the intermediate scrutiny that *Central Hudson* demands.

b.      *HHS Cannot Show That It Could Not Achieve Its Asserted Interest Through Alternative Less-Restrictive, And Equally Effective, Means*

HHS's inability to show that the Rule will directly and materially advance its asserted interests also contributes to an additional constitutional defect:  HHS cannot show that the Rule is "narrowly tailored," which in this context requires the government to come forward with "evidence that less restrictive means would fail." *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 372-73 (D.C. Cir. 2014), *overruled on other grounds by Am. Meat Inst.*, 760 F.3d 18; *see also Greater New Orleans Broad.*, 527 U.S. at 188 (explaining that in this context, "narrow tailoring" means "'a fit

that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served'" (citation omitted)).

For one thing, HHS could provide manufacturers with the less restrictive option of making price information available on their websites, as many pharmaceutical manufacturers already do pursuant to voluntary industry guidelines. *See* PhRMA, *PhRMA Guiding Principles: Direct to Consumer Advertisements about Prescription Medicines* 6 (2018), https://www.phrma.org/files/dmfile/PhRMA_Guiding_Principles_2018.pdf; *see also supra* at 11. Because a website allows for more context and explanation than a short television advertisement, pricing information can be provided in that setting in a way that is much less likely to mislead or confuse consumers.  HHS indicates that it "believe[s] that relatively few viewers will make use of th[at] approach," based in part on a study in which "one third of adults surveyed stated that they do not frequently use the internet."  84 Fed. Reg. at 20,745.  But the FDA has long allowed manufacturers to refer viewers of their television advertisements to websites where they can find additional information about safety and efficacy information that would otherwise have to be included in the advertisement itself.  *See* FDA, HHS, *Guidance for Industry: Consumer Directed Broadcast Advertisements* 3 (1999), https://www.fda.gov/media/75406/download (including, in the list of ways to satisfy "adequate provision" requirement, "[d]isclosure in the advertisement of an Internet web page (URL) address that provides access to the package labeling").  HHS offers no reason why websites that are sufficient for that health-and-safety-related purpose would be insufficient for this economic purpose.

There are numerous other options available to HHS as well, "without burdening a speaker with unwanted speech."  *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2376 (2018) (hereinafter "NIFLA") (quoting *Riley v. Nat'l Fed'n of Bind of N.C., Inc.*, 487 U.S. 781,

800 (1988)).  "Most obviously, it could inform [the public] itself" by paying to communicate its message rather than forcing manufacturers to include it in advertisements that are intended to be about health information, not pricing metrics.  *Id.*  For example, HHS recently finalized regulations requiring that Medicare Part D plans make patient-specific information about the cost of various treatment options readily accessible to doctors and other healthcare providers by January 2021.  *See Modernizing Part D and Medicare Advantage To Lower Drug Prices and Reduce Out-of-Pocket Expenses*, 84 Fed. Reg. 23,832, 23,833 (May 23, 2019) (to be codified at 42 C.F.R. pts. 422, 423).  With that system in place, HHS could pay providers to include counseling about treatment costs in their discussions with patients, in order to ensure consumers have an accurate picture of those costs that will help them make a decision that is right for them—rather than relying on an anchor price seen in a television advertisement that does not reflect their true out-of-pocket costs and may cause them to never ask their doctor about a particular beneficial treatment in the first place.  *See* 83 Fed. Reg. at 52,795 (acknowledging that "CMS could create a new payment code, in a budget neutral manner, for doctors to dialogue with patients on the benefits of drugs and drug alternatives").  HHS apparently believes that this system will not prove as effective as inclusion of WAC in direct-to-consumer advertisements, but it "has identified no evidence to that effect."  *NIFLA*, 138 S. Ct. at 2376.  Without such evidence, the Rule cannot satisfy this demand of intermediate scrutiny, either.

> **2.     *HHS Cannot Carry Its Burden To Show That The Compelled WAC Disclosure Rule Is Eligible For, And Would Pass Muster Under, Zauderer's More Deferential Review***

Perhaps because the Compelled WAC Disclosure Rule cannot plausibly pass intermediate scrutiny, HHS has defended the Rule against First Amendment criticisms primarily by arguing that it will not be subject to intermediate scrutiny in the first place.  Instead, HHS argues that the Rule's compelled speech mandate should be entitled to more deferential First Amendment review under

38

the standard articulated in *Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio*, 471 U.S. 626 (1985).  *See* 84 Fed. Reg. at 20,744.

That is incorrect.  *Zauderer* set forth a standard applicable in limited circumstances, where the government requires disclosure of "purely factual and uncontroversial information about the terms under which [products] will be available."  471 U.S. at 651.  Requirements of that narrow sort, the Court held, are permissible so long as they are not "unjustified" or "unduly burdensome." *Id.*; *see also NIFLA*, 138 S. Ct. at 2372 (discussing *Zauderer* standard).  The government bears the burden of showing that *Zauderer* applies, and that the challenged rule complies with it.  *See, e.g.*, *NIFLA*, 138 S. Ct. at 2377 ("Importantly, California has the burden to prove that the unlicensed notice is neither unjustified nor unduly burdensome."); *see also Am. Meat Inst.*, 760 F.3d at 25-26. For multiple reasons, HHS cannot do so here.

*First*, the required statement does not refer to the "terms under which [products] will be available" to the viewers of the advertisement.  *Zauderer*, 471 U.S. at 650.  Indeed, that is part of the problem:  As discussed above, *see supra* at 12, the "list price" that the Rule requires manufacturers to include in their direct-to-consumer advertisements is not the "list price" for consumers, but instead the "list price" for wholesale transactions.  HHS may believe that providing this information will nevertheless be helpful inasmuch as it may increase "public scrutiny" and prompt consumers to ask "whether the difference between the list price and what they actually pay out of pocket is reasonable."  84 Fed. Reg. at 20,733, 20,737.  But even for consumers who are not misled by the message, and understand that the "list price" they are seeing is not a price they would be required to pay (or anything close to it), *Zauderer* is inapplicable because the required message is not about the terms under which the advertised product is being sold.

*Second*, HHS will not be able to establish that the required statement is "purely factual and uncontroversial." *Zauderer*, 471 U.S. at 651. Compelled statements qualify as "purely factual and uncontroversial" within the meaning of *Zauderer* only where they are not "one-sided or incomplete," *Am. Meat Inst.*, 760 F.3d at 27, and are not misleading, "inflammatory," or "subject to misinterpretation by consumers," *RJ Reynolds Tobacco*, 696 F.3d at 1216-17; *see also Nat'l Ass'n of Mfrs.*, 800 F.3d at 539 (Srinivasan, J., dissenting) (acknowledging that "misleading disclosures would not qualify for *Zauderer*'s relaxed standard").

The statement compelled by the Rule is, to say the least, "subject to misinterpretation by consumers." *RJ Reynolds Tobacco*, 696 F.3d at 1216. The statement refers to WAC as the "list price" for the drug in a context—an advertisement specifically directed at consumers—that will lead many consumers to believe that the "list price" is equivalent to "suggested retail price." As defined in the Rule, however, the "list price" that must be included in the advertisement is something wholly different—a price charged to wholesalers that vastly exceeds the out-of-pocket cost paid by most consumers.[11] As set out above, nearly all Medicaid beneficiaries pay co-pays of $8 or less for covered drugs, regardless of a drug's WAC. Medicare beneficiaries, meanwhile, generally pay less than half of WAC—and, depending on formulary placement and how much spending they have already had over the course of the year, often pay *far* less than that. *See supra* at 13-14. And the statement is also misleading for Americans with private insurance, given that roughly half of such patients are responsible for only fixed co-pays not tied to WAC, and even

---

[11] It makes no difference that HHS has defined "list price" in this context to mean the WAC, because the relevant point is how consumers will understand the term—not what the agency has defined it to mean in section 403.1201(d) of volume 42 of the Code of Federal Regulations. "[I]f the law were otherwise, there would be no end to the government's ability to skew public debate by forcing companies to use the government's preferred language." *Nat'l Ass'n of Mfrs.*, 800 F.3d at 530 (citation omitted).

those with co-insurance obligations generally pay only a relatively small percentage of WAC.  *See supra* at 13-14.

The likelihood of misinterpretation here is impossible to miss.  Indeed, the FTC has promulgated guidance indicating that when companies advertise a "list price" to consumers that is "significantly in excess of the highest price at which substantial sales in the trade area are made [to consumers], there is a *clear and serious danger* of the consumer being misled."  16 C.F.R. § 233.3(d) (emphasis added).  The D.C. Circuit, too, has recognized that consumer advertisements suggesting that consumers are ordinarily charged a particular "list price" are "deceptive" where that "list price" is not an accurate representation of the price actually paid by consumers.  *Giant Food Inc. v. FTC*, 322 F.2d 977, 982 (D.C. Cir. 1963).[12]

The risk of misinterpretation is not eliminated by the statement's acknowledgment that "[i]f you have health insurance that covers drugs, your cost may be different."  84 Fed. Reg. at 20,758.  HHS itself admits that notwithstanding that proviso, patients still "might believe they are being asked to pay the list price rather than a co-pay or co-insurance."  *Id.* at 20,756.  Moreover, even where patients understand that they may not have to pay the full WAC, HHS has made clear that it intends them to treat WAC as "an anchor price or a reference comparison," with those patients believing that differences in WAC will translate into differences in out-of-pocket expenditure.  *Id.* at 20,735.  Millions and millions of patients who understand the disclosure that way, though, will have been misled:  Because their out-of-pocket expenditures are not based on WAC, WAC does *not* provide an accurate "anchor price" or "reference comparison" in their

---

[12] To be clear, describing WAC as a "list price" in a context other than advertisements specifically directed to consumers would not be inaccurate because it is, indeed, the actual price charged to wholesalers and other direct purchasers (minus certain rebates and discounts).  The problem arises from requiring manufacturers to use that "list price" terminology and figure in the context of consumer advertisements, where it is often irrelevant even for directional or comparative purposes.

particular circumstances.  *See supra* at 13-14.  Thus, even if HHS had evidence that *most* patients who saw the compelled statement would not be misled—and it does not—it cannot seriously dispute that the statement is "subject to misinterpretation by consumers" in a material number of circumstances.  *RJ Reynolds Tobacco*, 696 F.3d at 1216.

The message also is likely to be misunderstood by Americans without insurance.  Under the Rule, manufacturers are required to inform consumers that "*[i]f* you have health insurance that covers drugs, your cost may be different."  84 Fed. Reg. at 20,741 (emphasis added).  That statement conveys to patients who do *not* have insurance that their cost would be the same as WAC.  That is false.  Many uninsured patients are eligible for programs that would enable them to pay less than WAC for needed healthcare.  *See* Garthwaite Decl. ¶ 52.  Even for the uninsured, therefore, the Rule's required statement is not "purely factual."

The compelled statement is impermissibly "inflammatory," too.  *RJ Reynolds Tobacco*, 696 F.3d at 1216-17.  As the D.C. Circuit has recognized, the government cannot script its compelled speech mandates in a manner that is intended to "evoke an emotional response" in order to spur viewers to action that they might not take if presented with a more temperate message.  *Id.* at 1216.  Here, though, HHS's avowed reason for requiring disclosure of prices that are far higher than most consumers pay is to "provide manufacturers with an incentive to reduce their list prices by exposing overly costly drugs to public scrutiny."  84 Fed. Reg. at 20,733.  *Zauderer* does not shield that sort of "unabashed attempt[] to evoke emotion (and perhaps embarrassment)."  *RJ Reynolds Tobacco*, 696 F.3d at 1217.

In any event, the Compelled WAC Disclosure Rule would fail even under *Zauderer*'s more deferential standard.  The Supreme Court recently made clear that even when the government mandates a truthful, non-misleading disclosure, it still must show that the mandate is not

"unjustified" or "unduly burdensome." *NIFLA*, 138 S. Ct. at 2377 (citation omitted) (finding law unjustified because State did not show it provided information consumers could not already obtain and unduly burdensome because it threatened to drown out the regulated party's own message). For the reasons already discussed, HHS cannot satisfy either of those requirements. The Rule is unjustified because HHS has not shown and cannot meet its burden to show that requiring disclosure of WAC in television advertisements will in fact promote meaningful out of-pocket cost transparency to beneficiaries or reduce overall costs to the Medicare and Medicaid programs. And the Rule is "unduly burdensome" because its ostensible objectives could be accomplished more effectively through government-sponsored individual counseling and plan benefit disclosures, without distracting from the messages about the health benefits and risks of various treatment options on which manufacturers intend their direct-to-consumer advertisements to be focused.

## II.      THE REMAINING INTERIM-RELIEF FACTORS READILY SUPPORT A STAY

In First Amendment cases requesting interim or injunctive relief, the plaintiff's likelihood of success is almost always the "'determinative factor.'" *Pursuing Am.'s Greatness*, 831 F.3d at 511 (citation omitted). This is because the violation of First Amendment freedoms *necessarily* constitutes irreparable harm and because the government cannot have a valid interest in enforcing an unlawful regulation. *See id*. That logic applies with full force here. Since this Court is likely to conclude that the Rule is invalid, the other interim-relief factors—irreparable harm and the public interest—are easily satisfied.

### A.      PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE RULE GOES INTO EFFECT

The Supreme Court unequivocally has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Plaintiffs Merck, Eli Lilly, and Amgen ("Company Plaintiffs") all face

an imminent risk of losing those freedoms, as do members of Plaintiff Association of National Advertisers, Inc.  As the declarations attached to the Complaint show, compliance with the Compelled WAC Disclosure Rule would infringe their First Amendment rights by compelling them to engage in speech that they believe is harmful, misleading, and unethical.  *See* El-Dada Decl. (Merck) ¶ 16, ECF No. 1-3; Oleksiw Decl. (Lilly) ¶ 28, ECF No. 1-4; Marek Decl. (Amgen) ¶ 22, ECF No. 1-5.

To find that Plaintiffs would be irreparably harmed, moreover, the Court need not actually reach the merits of the First Amendment question.  HHS cannot dispute that Company Plaintiffs' First Amendment liberty interests in controlling what they do and do not say will be compromised if the Rule is allowed to go into effect; the most it can possibly argue is that it has a sufficient reason to *override* those interests.  The harm to Company Plaintiffs' interests thus does not depend on whether a constitutional violation will actually occur.  If the Court concludes that Plaintiffs are likely to prevail on the merits of the statutory argument (and thus show that First Amendment liberties are being harmed by HHS's unauthorized rulemaking), then it can enter a stay without needing to even reach the constitutional question.[13]

## B.     THE PUBLIC INTEREST AND BALANCE OF EQUITIES REQUIRE A STAY

A stay will also serve the public interest by preventing the enforcement of an unlawful, indeed unconstitutional, regulation.  Ordinarily, the interest of the public and the interest of the opposing party are analyzed separately.  But these two factors "merge when the Government is the

---

[13] Moreover, even setting aside the Rule's impact on Plaintiffs' constitutional rights, HHS has acknowledged that the Rule will cost manufacturers millions of dollars a year in time spent on ensuring compliance with its requirements.  *See* 84 Fed. Reg. at 20,756-57.  Those costs are "'uncompensable' in the sense that federal agencies enjoy sovereign immunity, and the waiver of sovereign immunity in the APA does not reach damages claims."  *Cal. Ass'n of Private Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018).  That monetary injury would constitute irreparable harm as well.

opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The analysis is further simplified in these types of cases because, as courts have long recognized, "the enforcement of an unconstitutional law is *always* contrary to the public interest."  *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).  Simply put, the public interest is promoted—not harmed—by the protection of Plaintiffs' First Amendment liberties.

The public interest also cannot be served by enforcing a regulation that exceeds an agency's statutory authority.  *See Brown & Williamson*, 529 U.S. at 161 (admonishing that courts cannot "effectuate the congressional purpose of protecting the public" by "extend[ing] the scope" of agency authority "beyond the point where Congress indicated it would stop").  Since the Compelled WAC Disclosure Rule exceeds HHS's authority under the Social Security Act, HHS cannot claim that the Rule's enforcement will serve a legitimate public interest.

Further, a stay is necessary to prevent the serious risks of harm that HHS itself has acknowledged:  Widespread public confusion about the cost of medical treatment; a corresponding reduction in patients' willingness to seek treatment for medical conditions; and, ultimately, worse health outcomes and higher long-term costs across the healthcare system as a whole.  *See* 84 Fed. Reg. at 20,756.  The public interest cannot be served by a rule that misleads the public and "discourage[s] patients from using beneficial medications."  *Id*.

## CONCLUSION

Plaintiffs thus respectfully request that the Court grant this motion and stay the Compelled WAC Disclosure Rule's effective date until at least 60 days after the Court's entry of final judgment in this case.

Dated:  June 14, 2019

Respectfully submitted,

/s/Richard P. Bress
Richard P. Bress (DC Bar No. 457504)
Daniel Meron (DC Bar No. 450419)
Michael E. Bern (DC Bar No. 994791)
    *admission pending*
Sarah M. Gragert (DC Bar No. 977097)
Benjamin W. Snyder (DC Bar No. 1020481)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304
Phone: 202.637.2200
Fax: 202.637.2201
rick.bress@lw.com

*Counsel for Plaintiffs Merck & Co., Inc., Eli Lilly and Company, and Amgen Inc.*

/s/Robert Corn-Revere
Robert Corn-Revere (DC Bar No. 375415)
Ronald G. London (DC Bar No. 456284)
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, D.C. 20006
Phone: 202.973.4200
Fax: 202.973.4499
bobcornrevere@dwt.com
ronnielondon@dwt.com

*Counsel for Plaintiff Association of National Advertisers, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 14, 2019, I caused a true and correct copy of the foregoing to

be served via FedEx upon the following:

United States Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

Alex M. Azar II
United States Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244

Seema Verma
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244

Jean Lin
Special Counsel
U.S. Dep't of Justice, Civil Div.
Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005

/s/*Richard P. Bress*
Richard P. Bress